George B. DICKINSON,
Plaintiff-Appellant,

v.

AUTO CENTER MANUFACTURING CO., a Florida Corporation, et al.,
Defendants-Appellees.

No. 76–4472.

United States Court of Appeals,
Fifth Circuit.

May 7, 1979.

Jack W. Hayden, Houston, Tex., for plaintiff-appellant.

Tom Alexander, Houston, Tex., Joe Teague Caruso, Merritt Island, Fla., Norman J. Reidmueller, Houston, Tex., for defendants-appellees.

Before GEE and VANCE, Circuit Judges, and HUNTER, District Judge.*

VANCE, Circuit Judge:

George B. Dickinson brought this action against Auto Center Manufacturing Co. and its president, John W. McLeod, for breach of contract and fraud. At the close of Dickinson's case, the trial court judge directed a verdict in favor of defendants. Dickinson appeals, arguing that the court should have permitted the case to be decided by the jury. We affirm in part, and reverse and remand in part.

Dickinson is a certified public accountant who practiced public accounting in El Paso, Texas, for many years. In 1971, John McLeod's wife, Martha McLeod, engaged Dickinson to organize records and to prepare a tax return for her Cape Canaveral, Florida, business, which was a sole proprietorship at that time. With Dickinson's help, Auto Center Manufacturing Co. was incorporated under the laws of Florida in March 1972. Martha McLeod owned all shares of the company's stock, and John McLeod was its president. The McLeods began encouraging Dicksinson to move to Cocoa Beach, Florida, and to become a full-time employee of the company. Dickinson and the McLeods discussed the conditions of

* District Judge of the Western District of Louisiana, sitting by designation.

Dickinson's possible employment on several occasions, but the negotiations were inconclusive. Dickinson claims that in May 1972 John McLeod, in Cocoa Beach, Florida, telephoned Dickinson at his home in El Paso, Texas, and agreed to employ Dickinson on Dickinson's terms. Dickinson testified that during this conversation, McLeod agreed to pay him a salary of sixty thousand dollars per year and, in September 1973, after the end of his first year of employment, a twenty-five thousand dollar bonus with which he could purchase twenty-five percent of the company's stock. At trial, John McLeod said that he did not remember a telephone conversation with Dickinson during which he urged Dickinson to work for the company and accepted Dickinson's conditions. He also denied having agreed to give Dickinson a bonus that could be used to purchase a twenty-five percent interest in the company. The parties did not execute a written employment agreement.

Dickinson withdrew from his Texas accounting partnership,[1] moved to Florida, and began working for Auto Center Manufacturing Co. in July 1972. On several occasions, John McLeod and Dickinson discussed the issuance of stock to Dickinson and John McLeod's sons, Stephen McLeod and John McLeod, Jr. Dickinson prepared stock certificates dated March 27, 1973, in which he was allotted twenty-five percent of the company's stock; John McLeod, Jr., and Stephen McLeod were each allotted twenty percent; John McLeod was allotted ten percent; and Martha McLeod retained twenty-five percent of the stock. Dickinson claims that the certificates were drafted at John McLeod's request. The certificates, however, were never signed. On the same day, March 27, 1973, John McLeod, Martha McLeod, Dickinson, John McLeod, Jr., and Stephen McLeod met in the company's Florida offices to discuss the assignment of stocks. Notes taken by John McLeod at this meeting and admitted into evidence at the trial contain the phrase, "our goal [$]2,000,000 personal net worth," and the figures, "51%–25%–24%." Dickinson argues that at the meeting the McLeods agreed that twenty-five percent of the stock would be issued to Dickinson immediately in exchange for twenty-five thousand dollars to be paid on September 30, 1973, and that Martha McLeod would retain seventy-five percent of the stock. John McLeod, Jr., and Stephen McLeod, Dickinson testified, were to be issued twenty-four percent of the stock leaving Martha McLeod with fifty-one percent when John and Martha McLeod achieved a personal net worth of two million dollars and were relieved of personal guarantees. John McLeod, however, testified that no stock was to be issued until the two million dollar goal was reached. No stock was, in fact, issued, and Martha McLeod remains the holder of all shares of Auto Center Manufacturing Co. stock. Dickinson's employment with Auto Center Manufacturing Co. was terminated on June 26, 1973, four days before he would have completed his first year with the company.

In his complaint, Dickinson alleged that Auto Center Manufacturing Co. and John McLeod[2] fraudulently induced him to leave his partnership in Texas and to accept employment with the defendants in Florida and that they breached their employment contract with him. At trial, Dickinson attempted to show that the parties made two oral employment agreements and that both agreements had been breached by the defendants. Dickinson claims that during the May 1972 telephone conversation he promised to work for the company in exchange for John McLeod's promise that the company would employ him until both parties terminated the relationship and that it would pay him a bonus with which he could

1. Dickinson received $80,000 for his partnership interest and agreed not to compete with his former partners for ten years.

2. Martha McLeod, Stephen McLeod, and John McLeod, Jr., were also defendants in Dickinson's original complaint. The trial court, however, found that it had no personal jurisdiction over these three defendants and granted their motions to dismiss. Although Dickinson urges this court to find that Martha McLeod was erroneously dismissed, he does not address the court's lack of personal jurisdiction over her.

purchase twenty-five percent of the company's stock after he had completed his first year of employment. At the March 27, 1973, meeting in Florida, Dickinson contends, the defendants agreed to issue twenty-five percent of the company's stock to him immediately. In directing a verdict for the defendants at the close of Dickinson's case, however, the trial judge allowed none of his claims to be considered by the jury.

In a diversity case like the one *sub judice*, a federal rather than a state test is used to determine whether a directed verdict was warranted by the evidence. *Blanchard v. Engine & Gas Compressor Services, Inc.*, 575 F.2d 1140, 1143–1144 (5th Cir. 1978); *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1125 (5th Cir. 1978); *Boeing Co. v. Shipman*, 411 F.2d 365, 368 (5th Cir. 1969). The following standard was established in *Boeing Co. v. Shipman* :

> If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.

*Id.* at 374. In determining the propriety of a directed verdict under this test, a reviewing court must scrutinize the evidence in the light most advantageous to the party who opposed the motion and draw all reasonable inferences most favorable to that party. *McCullough v. Beech Aircraft Corp.*, 587 F.2d 754, 758 (5th Cir. 1979); *Wansor v.*

*George Hantscho Co.*, 570 F.2d 1202, 1207 (5th Cir.), *cert. denied*, —— U.S. ——, 99 S.Ct. 350, 58 L.Ed.2d 344 (1978); *Callon Petroleum Co. v. Big Chief Drilling Co.*, 548 F.2d 1174, 1176 (5th Cir. 1977). A jury question is created only when there is a conflict in substantial evidence. *Krivo Industrial Supply Co. v. National Distillers & Chemical Corp.*, 483 F.2d 1098 (5th Cir. 1973); *Olympic Insurance Co. v. H. D. Harrison, Inc.*, 463 F.2d 1049 (5th Cir. 1972), *cert. denied*, 410 U.S. 930, 93 S.Ct. 1373, 35 L.Ed.2d 593 (1973); *Boeing Co. v. Shipman, supra.*

■ Dickinson first argues that the question whether defendants fraudulently induced him to accept employment with Auto Center Manufacturing Co. should have been submitted to the jury.[3] Under *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), the conflicts of law rules of Texas, the forum state, must be applied in this case. Texas courts use the *lex loci delicti* approach in most tort cases. *Doss v. Apache Powder Co.*, 430 F.2d 1317 (5th Cir. 1970); *Seguros Tepeyac, S. A., Compania Mexicana de Seguros Generales v. Bostrom*, 347 F.2d 168 (5th Cir. 1965). The substantive law of Texas thus governs Dickinson's fraud claim.[4]

■ To establish fraudulent inducement to contract under Texas law, Dickinson was required to show either that the defendants misrepresented an existing or past fact or that the defendants made a promise intending not to perform the promised act at the time the promise was made. *Fredonia Broadcasting Corp. v. RCA Corp.*, 569 F.2d 251, 258 (5th Cir.), *cert. denied*, —— U.S. ——, 99 S.Ct. 177, 58 L.Ed.2d 167 (1978); *Karp v. Cooley*, 349 F.Supp. 827, 837

---

**3.** Auto Center Manufacturing Co. and John W. McLeod argue that the fraud claim's only function was establishing the court's in personam jurisdiction over two of the five defendants named in the original complaint. The district judge relied on the fraud claim in his memorandum and order sustaining the court's jurisdiction over Auto Center Manufacturing Co. and John McLeod, but granting the motions to dismiss of Martha McLeod, John McLeod, Jr., and Stephen McLeod.

**4.** Although John McLeod was in Florida when he allegedly made the fraudulent misstatements, Dickinson was in Texas when they were communicated to him, and, in Texas, fraud is "a two-element tort which is not actionable until relied upon to the detriment of the person to whom the representations were made." *Hoppenfeld v. Crook*, 498 S.W.2d 52, 56 (Tex. Civ.App.1973).

(S.D.Tex.1972), *aff'd*, 493 F.2d 408 (5th Cir.), *cert. denied*, 419 U.S. 845, 95 S.Ct. 79, 42 L.Ed.2d 73 (1974) (adding opinion given with intent to deceive). The record, however, shows that Dickinson did not produce enough evidence from which fraud could be inferred to justify the submission of the issue to the jury. With all inferences most favorable to his claim drawn, Dickinson established only that a promise given to him was not kept. Under "Texas law, the mere failure to perform a promise is not itself any evidence of an intent not to perform." *Fredonia Broadcasting Corp. v. RCA Corp.*, 569 F.2d at 258. The directed verdict on the fraud claim was thus proper.[5]

■ Dickinson next claims that the jury should have been allowed to decide whether defendants should be held liable for breaching the oral contract made during the May 1972 telephone conversation. The district court directed a verdict on the claim based on the May 1972 oral agreement because it was barred by the Statute of Frauds. At trial, Dickinson testified that during the May 1972 telephone conversation he agreed to begin working for defendants in Florida on July 1, 1972, and stipulated that he was to receive the stock bonuses on September 30, 1973. When he told John McLeod that he considered the transfer a permanent one and that he intended to work for Auto Center Manufacturing Co. until his retirement, Dickinson testified, John McLeod answered, "Fine, come on down." Dickinson was several years away from retirement age in May 1972, and he insisted that the stock not be given to him until a year and four months after the contract was made. Dickinson's own testimony shows that this oral employment agreement by its terms could not be performed within one year from May 1972, "the date of making the agreement."[6] Tex.Bus. & Com.Code § 26.01(b)(6). The contract is thus within the Texas Statute of Frauds[7] and is unenforceable. *See Mercer v. C. A. Roberts Co.*, 570 F.2d 1232 (5th Cir. 1978); *Chevalier v. Lane's, Inc.*, 147 Tex. 106, 213 S.W.2d 530 (1948); *Paschall v. Anderson*, 127 Tex. 251, 91 S.W.2d 1050 (1936).

■ Because his reliance on defendants' promises caused him to leave Texas, move to Florida, and work for Auto Center Man-

---

5. The same result would be reached if Florida substantive law were applied. Under Florida law, "a mere broken promise does not constitute fraud." *Plantation Key Developers, Inc. v. Colonial Mortgage Company*, 589 F.2d 164, 172 (5th Cir. 1979).

6. Dickinson argues that, under *Miller v. Riata Cadillac Co.*, 517 S.W.2d 773 (Tex.1974), the Statute of Frauds does not apply to this contract because "a practice of not actually compensating an employee for the services he has rendered until sometime after the year in question will not bring the contract within the Statute of Frauds as long as full performance . . within the year is possible." *Id.* at 776. *Miller* applies only when the terms of the agreement permit the contract to be performed within one year. *Id.* at 775. The terms of the oral agreement in issue, however, did not allow performance within one year. When "by the terms of the oral agreement, its period is to extend beyond a year from the date of its making, the mere possibility of its termination by operation of law within the year, because of death or other fortuitous event, does not render . . the Statute [of Frauds] inapplicable." *Chevalier v. Lane's Inc.*, 147 Tex. 106, 111, 213 S.W.2d 530, 532 (1948).

7. Because a Texas state court would apply that state's Statute of Frauds, *Paine v. Moore*, 464 S.W.2d 477 (Tex.Civ.App.1971), we must also. *Klaxon v. Stentor, supra*. *Cf. Nelms v. State Farm Mut. Auto. Ins. Co.*, 463 F.2d 1190 (5th Cir. 1972) (Louisiana Direct Action Statute). The Texas Statute of Frauds contains the following provisions:

(a) A promise or agreement described in Subsection (b) of this section is not enforceable unless the promise or agreement, or a memorandum of it, is

(1) in writing; and

(2) signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him.

(b) Subsection (a) of this section applies to

. . . . .

(6) an agreement which is not to be performed within one year from the date of making the agreement . . . .

Tex.Bus. & Com.Code § 26.01.

Section 8.319 of the Texas Business and Commercial Code is a statute of frauds that affects the sale of securities, but § 8.319 does not apply to an oral employment contract in which stock is to be transferred as consideration for the acceptance of employment. *Bowers Steel, Inc. v. DeBrooke*, 557 S.W.2d 369 (Tex.Civ. App.1977).

ufacturing Co. for almost a year, Dickinson contends that equitable principles should prevent defendants from asserting the Statute of Frauds. "However, the Texas courts have made clear that an oral agreement within the statute of frauds will not be enforced except in egregious situations." *Mercer v. C. A. Roberts Co.*, 570 F.2d at 1237. Citing *Wheeler v. White*, 398 S.W.2d 93 (Tex.1965), Dickinson asserts that the doctrine of promissory estoppel[8] should be applied to prevent defendants from denying that the contract is enforceable. Reliance on promissory estoppel, however, is misplaced, since the doctrine precludes a Statute of Frauds defense only when a party has relied to his or her detriment on "a second promise—a promise to reduce the first promise to writing." *21 Turtle Creek Square, Ltd. v. New York State Teachers' Retirement System*, 432 F.2d 64, 65 (5th Cir. 1970), *cert. denied*, 401 U.S. 955, 91 S.Ct. 975, 28 L.Ed.2d 239 (1971). Dickinson has shown reliance on no such second promise.

■ An employee's partial or full performance of his obligations under an oral employment agreement has also been held insufficient to remove the agreement from the Texas Statute of Frauds, when such performance was not completed within a year of the making of the contract. *E. g., Mercer v. C. A. Roberts Co., supra; Collins v. McCombs*, 511 S.W.2d 745 (Tex.Civ.App. 1974). In *Collins v. McCombs*, a Texas court refused to enforce an oral agreement, the terms of which entitled plaintiff to a forty percent share of a miniature train ride business, although plaintiff had fully performed his obligation of operating the train for three years and had received only a monthly salary. Similarly, in *Mercer v. C. A. Roberts*, this court found unenforceable an oral agreement in which an employer promised to pay an employee quarterly incentive bonuses in addition to his salary, even though the employee had worked for eight months and had been paid only his

regular salary. Dickinson completed performance of his obligations under the May 1972 oral contract in June 1973 and was paid only his salary of sixty thousand dollars for the year; nevertheless, the contract is within the Statute of Frauds, an embodiment of clear legislative policy, and is unenforceable. Recovery for breach of contract under the May 1972 agreement is thus precluded, and the verdict on that issue was properly directed. *See Mercer v. C. A. Roberts Co., supra.*

■ Finally, Dickinson contends that the jury should have been permitted to determine whether the defendants breached the contract that he claims was formed on March 27, 1973. The alleged March 27, 1973, oral promise to issue Dickinson stock was to have been performed immediately; thus it is not made unenforceable by the Texas Statute of Frauds. Because this second agreement was made in Florida and was to be performed completely within Florida, under Texas conflicts of law rules, we must apply Florida substantive law in deciding this issue. *See Crouch v. Crouch*, 566 F.2d 486 (5th Cir. 1978); *Ramirez v. Autobuses Blancos Flecha Roja, S. A. de C. V.*, 486 F.2d 493 (5th Cir. 1973); *Dailey v. Transitron Electronic Corp.*, 475 F.2d 12 (5th Cir. 1973).

■ To establish a claim for breach of contract in Florida, a claimant must show "the existence of a contract, a breach thereof and damages flowing from the breach." *Knowles v. C. I. T. Corp.*, 346 So.2d 1042, 1043 (Fla.App.1977). Although the evidence on the terms of the oral contract was conflicting, both John McLeod and Dickinson testified that some sort of an agreement was reached on March 27, 1973.[9] Dickinson thus sufficiently proved that a contract existed. *See Jefferson Disposal Co. v. Green*, 311 So.2d 785 (Fla.App.1975); *Welborn v. Kemp*, 141 Fla. 89, 192 So. 469 (1939). Resolving conflicts in the evidence

---

8. Florida courts have refused to accept the doctrine of promissory estoppel as a means of avoiding the Statute of Frauds. *Tanenbaum v. Biscayne Osteopathic Hospital, Inc.*, 190 So.2d 777 (Fla.1966).

9. John McLeod was the first witness called by the plaintiff. During his cross-examination, the following exchange occurred:

Q Now, then, on March 27, 1973, to put us in context, you had two Dickinsons and a

to determine the exact terms of the contract was properly the jury's responsibility. *See Nunez v. Superior Oil Co., supra; Pan America Bancshares, Inc. v. Trask*, 278 So.2d 313 (Fla.App.1973).

■ Some evidence indicates that the parties intended the March 27, 1973, agreement to be formally executed. The rule that when "parties intend a negotiation to be reduced to a formal writing there is no binding contract until a formal writing is achieved" applies, however, only when "the parties do not intend to be bound by their negotiations until a formal written contract is executed." *Housing Authority v. Foster*, 237 So.2d 569, 571–572 (Fla.App.1970).[10] Dickinson's evidence sufficiently supported the conclusion that the parties' negotiations had reached the stage of a binding contractual relationship to justify the submission of the issue to the jury. *See Housing Authority v. Foster, supra.*

Dickinson also sufficiently established that defendants breached the March 27, 1973, agreement. The defendants refused to issue twenty-five percent of Auto Center Manufacturing Co.'s stock to Dickinson. This failure can be found to have violated the terms of the agreement when those terms are viewed in the light most favorable to Dickinson.

■ In his proof of damages for breach of the March 27, 1973, contract, Dickinson attempted "to affirm the contract, insist on the benefit of his bargain, and seek those damages which will place him in the position he would have been if the contract had been completely performed." *Sundie v. Lindsay*, 166 So.2d 152, 153 (Fla.App.1964). Had the contract been performed, Dickinson claims that he would have received twenty-five percent of the stock in Auto Center Manufacturing Co. Norman W. Pittenger, an expert witness called by plaintiff, testified on the value of shares in a small, closely held corporation like Auto Center Manufacturing Co. The trial court, however, sustained defendants' objection and excluded much of Mr. Pittenger's testimony. The trial judge was overly rigid in his approach to proof of the value of closely held stock. Dickinson's proffered evidence was sufficient to enable the jury to determine the market value of twenty-five percent of the stock in Auto Center Manufacturing Co. *See generally Aldon Industries, Inc. v. Don Myers & Associates, Inc.*, 517 F.2d 188 (5th Cir. 1975); *Ballard v. El Dorado Tire Co.*, 512 F.2d 901 (5th Cir. 1975).

Dickinson produced substantial evidence on each element of his claim that defendants breached the oral contract made on March 27, 1973. Based on this evidence,

---

friend and no data processing, computerized data processing. And you had a meeting, right?

. . . . .

A Yes, sir.
Q By that time, had you reached the goal that you and Mr. Dickinson had discussed when you were meeting in reference to getting him hired?
A No, sir. That is why those papers were made up.
Q Now, at that time, did you say anything to Mr. Dickinson about letting him either buy or have twenty-five percent of the stock if certain goals were met?
A Yes, sir.
Q And what did you tell him in reference to letting him either buy or have—which was it? Were you going to let him have twenty-five percent or buy twenty-five percent?
A We were going to earn it. That is what this paper was for. I would have pep talks, try to give pep talks to the people and get the

job on the road. The first paper gave a goal of two million dollars that our company would be worth something. We would strive towards a goal, do something and then, if this was done, if the conditions were met. . . I told them when these conditions were met, when we could get our company in a good condition, I was happy to go ahead and do anything. And that is why I put these figures down. And if you will notice one thing, I even put down myself, and you'll see myself, ten percent. I was willing to take ten percent if these conditions could be met.
Q Now, were the conditions ever met?
A No, sir.

10. Parties may "make an enforceable contract binding them to prepare and execute a subsequent agreement . . . provided that the agreement is definite and certain upon all subjects to be embraced." *Bluevack, Inc. v. Walter E. Heller & Co.*, 331 So.2d 359, 360 (Fla. App.1976).

reasonable persons could conclude that Dickinson was entitled to recover the value of twenty-five percent of Auto Center Manufacturing Co. stock. *See Boeing Co. v. Shipman, supra.* The motion for a directed verdict on this issue should not have been granted. We remand for a new trial on the issue of defendants' liability for breaching the March 27, 1973, oral agreement.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.